IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EMANUEL JAMES HARRISON, | § | |
| | § | |
| Movant, | § | |
| | § | |
| V. | § | No. 3:15-cv-1653-G-BN |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Movant Emanuel James Harrison, at the time a federal prisoner, filed a *pro se* motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence raising grounds that his guilty plea was involuntary and that his trial counsel provided constitutionally ineffective assistance of counsel ("IAC"). *See* Dkt. No. 2.

The Court denied his motion. *See Harrison v. United States*, No. 3:15-cv-1653-G, 2016 WL 6471294 (N.D. Tex. Oct. 11, 2016), *rec. accepted*, 2016 WL 6462048 (N.D. Tex. Nov. 1, 2016).

Harrison appealed. *See* Dkt. No. 25. And the United States Court of Appeals for the Fifth Circuit granted a certificate of appealability ("COA") as to "whether the district court abused its discretion by not holding an evidentiary hearing before denying Harrison's claim that he received ineffective assistance of counsel due to a conflict of interest." Dkt. No. 28.

The Fifth Circuit then determined that failure to hold an evidentiary hearing as to this conflict of interest issue "under the circumstances presented was an abuse

of direction" and reversed and remanded this case for further proceedings consistent with its opinion. *United States v. Harrison*, 910 F.3d 824 (5th Cir. 2018).

Senior United States District Judge A. Joe Fish referred Harrison's case to the undersigned United States magistrate judge "for further proceedings consistent with the Fifth Circuit's mandate, and for recommendation or determination." Dkt. No. 25 (citing 28 U.S.C. § 636(b)). Accordingly, the undersigned set an evidentiary hearing limited to the issue of an actual conflict of interest, as discussed in the Fifth Circuit's decision, and, for that reason, appointed Harrison counsel under 18 U.S.C. § 3006A, as implemented by the Court's Criminal Justice Act ("CJA") Plan, *see* MISC. ORDER NO. 3 (N.D. Tex. Dec. 20, 2018), and Rule 8(c) of the Rules Governing Section 2255 Proceedings for the United States District Courts. *See* Dkt. No. 36.

With the benefit of the May 23, 2019 evidentiary hearing, *see* Dkt. Nos. 47, 48, & 50, the undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should deny Harrison's IAC claim based on an actual conflict of interest.

## Applicable Background

Harrison "pled guilty pursuant to a plea agreement to one count of conspiracy to file false claims," in violation of 18 U.S.C. § 287; this Court denied his "motion to withdraw his guilty plea without an evidentiary hearing"; and "[h]e was sentenced to eighty-four months of imprisonment and three years of supervised release." *Harrison v. United States*, 777 F.3d 227, 229 (5th Cir. 2015). He appealed, "challenging only the district court's refusal to hold an evidentiary hearing on his withdrawal motion," *id.*,

and the Fifth Circuit affirmed his conviction and sentence, *see id.*

The IAC claim now before the Court turns on whether, prior to Harrison's signing his plea agreement later the same day, his trial counsel, Michael P. Gibson, labored under a conflict of interest by being present while Harrison's co-defendant, Fread Jamille Jenkins, executed his plea agreement – the factual resume of which stated that Jenkins conspired with Harrison to defraud the United States – in the conference room of Gibson's office while Jenkins's own counsel, James Jamison, was out of town – and whether, if a conflict arose, that conflict amounted to an actual conflict of interest by affecting Gibson's representation of Harrison.

Going back to August 2013, the four remaining defendants in the underlying criminal case – Harrison, Jenkins, Jarrod Phread Altman, and Jason Phread Altman – were set for trial to begin on Monday, August 5. Some of the defendants and their lawyers met at Gibson's office on Thursday, August 1. Gibson testified that, prior to that day, "[t]here had [only] been discussions about plea agreements." Dkt. No. 50 (evidentiary hearing tr.) at 7:14-19. But, on that day, counsel obtained proposed plea agreements from the government. *See id.* at 20:13-22:7; Gov't Exs. 1 & 2 (defense counsel call notes and CJA time records).

Gibson characterized the agreements as "an all-or-nothing deal [amongst all the remaining defendants] as presented in its tone by the government, to" all defense counsel – a message he conveyed to Harrison. Dkt. No. 50 at 26-27 ("[E]veryone had to plead for the offers to be on the table. ... [I]f anybody failed to plead, they would be

withdrawn. [Harrison] knew that. He understood that, I'm sure."); *see also id.* at 55:17-24.

Jenkins's lawyer, James Jamison, was not at Gibson's office that day, as he was on his way back to Dallas from a vacation in Colorado. *See id.* at 29:16-21; Gov't Ex. 1. But Jenkins nevertheless went to Gibson's office on August 1. According to Harrison and Jenkins, he went there that day to offer a statement exonerating Harrison. *See* Dkt. No. 2-1 at 50; Dkt. No. 50 at 40:5-19 & 55:25-56:9. Other evidence – from Gibson and Jamison – reflects that Jenkins went to the office that day solely to execute his plea agreement. *See* Dkt. No. 50 at 8:24-9:13, 23:25-24:12, & 33:22-37:15; Gov't Ex.1 (Jamison's CJA time records).

Regardless, it is undisputed that Jenkins did, on that day, sign a plea agreement that included a factual resume that provided that he "did knowingly and willfully conspire with" his five co-defendants – including Harrison – "to defraud the United States ... by obtaining, and aiding the obtaining of the payment of false, fictitious and fraudulent claims, in the form of federal income tax refunds." *United States v. Jenkins*, No. 3:11-cr-339-L (04) (N.D. Tex.), Dkt. Nos. 140 & 142; *see also id.*, Dkt. No. 142 at 4 (indicating that, although Jenkins signed the factual resume on August 1, Jamsion signed it on August 2).

And it is not disputed that Harrison did not sign his plea agreement until after Jenkins signed his, *see* Dkt. No. 50 at 14:19-15:10, and only after first leaving Gibson's office without signing the agreement, *see id.* at 50:2-53:13; *see also id.* at 53:12-13 (testimony of Gibson's associate, Carl David Medders, indicating that, during the day

-4-

"things had gotten heated" with Harrison).

Harrison further testified that, on August 1, it was his intention "to continue to trial on that Monday." *Id.* at 55:24; *see id.* at 57:4-8 (testifying that he told Jenkins, after Jenkins signed his plea agreement, "No shit. I'm not taking no plea deal. I'm not doing this."); *id.* at 57:9-10 ("And Mike kept trying to get me to come and take the plea deal. And I kept telling him, 'It's not going to happen.'"); *id.* at 59:7-12 ("And so [Gibson] started reading the plea agreement and the factual resume over and I unequivocally said, 'I'm not signing this. I didn't do it. I wasn't involved in this conspiracy and I've never met or interacted with the people in the overt acts and the relevant conduct that's been attributed.'"); *but see* Gov't Ex. 2; Dkt. No. 50 at 21:19-22:10 (Gibson's call notes from that day indicated "[Harrison] okay with 84 months. See at 2 P.M.").

The next day, however, Harrison pled guilty. *See United States v. Harrison*, No. 3:11-cr-339-L (03) (N.D. Tex.), Dkt. Nos. 138, 143, 144, & 145. But, approximately one month later, he moved to withdraw his guilty plea, *see id.*, Dkt. No. 154; after that motion was denied, *see id.*, Dkt. No. 158, he requested reconsideration, *see id.*, Dkt. No. 160; and he continued – to the day of his sentencing – to request withdrawal of the guilty plea, *see id.*, Dkt. No. 223 at 7:16-12:1.

Against this background, the Court must examine the interaction between Jenkins and Gibson on August 1, 2013 and determine whether this interaction resulted in an attorney-client relationship, however transient, that led to Gibson laboring under an actual conflict of interest, one that adversely affected his representation of

Harrison.

Their interaction that day lasted anywhere from 30 to 45 minutes (according to Jenkins) to from an hour to an hour and a half (according to Gibson). *See* Dkt. No. 50 at 44:3-5; 19:12-14. And, although Harrison testified otherwise, the weight of the evidence is that only Gibson and Jenkins were in the conference room when Gibson presented Jenkins with the plea papers. *See, e.g., id.* at 46:1-5.

According to Gibson, he spoke with Jamison first, who told Gibson that he was out of town and asked if Jenkins could come to Gibson's office to execute his plea papers. *See* Dkt. No. 50 at 8:21-9:13. Based on Jamison's testimony, he may not have known exactly when Jenkins was going to Gibson's office. *See id.* at 36:21-24. But Jamison did speak with Gibson on August 1, *see id.* at 29:22-30:11, and he gave Gibson "permission and authority" to review the plea agreement with Jenkins, *id.* at 36:25-37:5; *see also id.* at 35:16-21 (Jamison confirming that, although he did not think he was handing over representation of Jenkins to Gibson, he did "give Mr. Gibson permission to continue talking to [his] client and to get his signature on the plea papers as [he] thought a plea was in [his] client's best interest").

Jenkins testified that he did not recall going over the plea agreement with Jamison prior to meeting with Gibson. *See id.* at 42:20-25.

Gibson characterized his role as "just to accommodate [Jenkins's] signature." *Id.* at 10:1; *see id.* at 10:1-10:10 ("He had already agreed to the terms with his lawyer, so I do remember meeting him – we have a small work conference room off our lobby – meeting with Mr. Jenkins there and I think we had factual resume, plea agreement,

we may have had some other document and I remember him reading them and me being sure that he signed all the signatures. But I did not talk with him about it or give him any advice or recommendations or anything like that whatsoever. Just ensured that he signs all the places on the document that the documents required."); *see also id.* at 10:14-22 (Gibson testifying that, while he stayed in the room with Jenkins, he did not recall Jenkins asking him questions); *id.* at 16:21-17:25 (Gibson further testifying that he was under the impression that Jamison had already spoken with Jenkins about the plea agreement; that Jamison "gave [him] permission to talk to his client and help him out"; and that he "remember[s] telling [Jenkins] the names of what the documents were and pointed out ... where you should sign and something to the effect of, 'If you want to sign them, sign them. If you don't, you don't. Whatever.'").

Gibson insisted that he "offered absolutely no legal advice" to Jenkins and "did not explain anything to him to try to tell him what [the plea papers] meant or didn't mean." *Id.* at 18:24-19:2; *see also id.* at 22:20-23:5; 24:13-15 (further testifying that he did not discuss the facts of the case with Jenkins; that it was not his impression that he had "undertaken representation of him"; and that the interaction with Jenkins did not affect how he proceeded with his representation of Harrison).

Jenkins testified that Gibson conveyed to him "that it was a binding plea agreement for 84 months" and went over the elements of the offense. *Id.* at 43:1-14; *see also id.* at 43:15-17 ("[H]e just kind of read through [the papers] and he explained to me how they had the facts of the case and then I signed it.").

Gibson testified that he did not recall Jenkins saying anything regarding a

statement exonerating Harrison; that he did not recall discussing this possibly with Harrison; that he did not expect that Jenkins would testify on behalf of Harrison at any trial; and that he did not speak with Jamison about the possibility of Jenkins doing so. *See id.* at 17:10-15; 23:25-24:12. Harrison testified otherwise – "I had been telling Mike Gibson that my codefendant [Jenkins] wanted to come in and give a statement, affidavit, testifying that I didn't have any involvement and he was willing to testify for everybody." *Id.* at 55:25-56:3. And, while Jenkins testified that he came to Gibson's office to offer a statement on behalf of Harrison, Jenkins never testified that he told Gibson that. *See id.* at 38:7-46:12; Dkt. No. 2-1 at 50.

Given this conflicting testimony, to the extent necessary to resolve the issue before the Court, the undersigned, based on testimony from the evidentiary hearing, does not find credible that Jenkins would come to Gibson's office on August 1 with the sole intention of offering exonerating evidence and instead do the opposite – sign a plea agreement, the factual resume of which implicated his co-defendants – without a word of explanation or protestation. *See, e.g.,* Dkt. No. 50 at 42:12-15 ("Q. Now, what did you think when you were sitting in the conference room and you were presented with plea papers on your case? A. I didn't think nothing about it.").

### Legal Standards

Relief under Section 2255 is limited to a claim "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. §

2255(a). And a movant "has a burden of sustaining his contentions on a § 2255 motion by a preponderance of the evidence," *United States v. Bondurant*, 689 F.2d 1246, 1251 (5th Cir. 1982) (citing *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)) – that is, "evidence by fifty-one percent, or to the extent of more likely than not," *United States v. Diaz*, 344 F. App'x 36, 43 (5th Cir. 2009) (per curiam) (citation, brackets, and internal quotation marks omitted); *see also Coon v. United States*, 441 F.2d 279, 280 (5th Cir. 1971) ("A movant in a collateral attack upon a judgment has the burden to allege and prove facts which would entitle him to relief."); *United States v. Ellis*, Crim. No. 13-286, 2018 WL 1005886, at *2 (E.D. La. Feb. 21, 2018) ("Ultimately, the petitioner bears the burden of establishing his claims of error by a preponderance of the evidence." (citing *Wright*, 624 F.2d at 558)).

"The Sixth Amendment protects a defendant's right to effective assistance of counsel." *Bostick v. Quarterman*, 580 F.3d 303, 306 (5th Cir. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984)). "To establish a deprivation of that right, a defendant ordinarily must show 'that counsel's representation fell below an objective standard of reasonableness' and 'that the deficient representation caused prejudice.'" *Id.* (quoting *Coble v. Quarterman*, 496 F.3d 430, 435 (5th Cir. 2007)); *see also Buck v. Davis*, 580 U.S. ____, 137 S. Ct. 759, 775 (2017) (reaffirming that "[i]t is only when the lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed ... by the Sixth Amendment' that *Strickland*'s [performance] prong is satisfied" (citation omitted)).

But "[t]he Sixth Amendment right to counsel includes the 'right to

representation that is free from any conflict of interest.'" *United States v. Culverhouse*, 507 F.3d 888, 892 (5th Cir. 2007) (quoting *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993)). And "[p]rejudice is presumed ... in the narrow class of cases where a 'defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."'" *Bostick*, 580 F.3d at 306 (quoting *Strickland*, 466 U.S. at 692 (citing, in turn, *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348 (1980))); *see also Culverhouse*, 507 F.3d at 892 ("The defendant need not show prejudice in the sense that the outcome of the proceeding would have been different absent the conflict because prejudice is presumed upon a showing of an actual conflict that adversely affected representation." (citing *Perillo v. Johnson*, 205 F.3d 775, 781-82 (5th Cir. 2000))).

A panel of the Fifth Circuit has explained the "slightly different burden" that "[a] petitioner alleging a Sixth Amendment violation on the basis of counsel's purported conflict of interest" bears, starting with *Sullivan*, in which

> the Supreme Court considered whether "the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel," and noted with approval its prior holding that there are circumstances under which an attorney may represent multiple criminal defendants in connection with the same criminal transaction without offending the Sixth Amendment. The Court held that if the defendant did not object to the multiple representation at trial, such an arrangement can only give rise to a cognizable IAC claim if it "actually affected the adequacy of [the petitioner's] representation." In a later gloss on the *Sullivan* standard, the Court reiterated that "'[a]n actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.'" If the defendant establishes the existence of such a conflict, though, the prejudice prong of *Strickland* is relaxed such that the petitioner need not show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."

-10-

The crux of the inquiry, therefore, is whether "trial counsel had a conflict of interest that hampered the representation" in the sense that "counsel actively represented conflicting interests." "[A] conflict will exist only when counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." Such a conflict does not arise, however, when the alleged conflict is merely "hypothetical," "speculative[,] or potential." Relevant factors may include (1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter; (3) how close are the multiple representations in time; and (4) whether the prior representation has terminated. As we have noted, *Sullivan*'s "actual conflict" and "adverse effect" elements are "rather vague," so IAC claims predicated on such conflicts are "tightly bound to the particular facts."

*Morin v. Thaler*, 374 F. App'x 545, 551-52 (5th Cir. 2010) (per curiam) (footnotes omitted).

## Analysis

I.   <u>Attorney-client relationship</u>

An "essential predicate to" Harrison's conflict-of-interest claim under *Sullivan* is that Gibson represented both he and Jenkins. *Lombardo v. United States*, 222 F. Supp. 2d 1367, 1386 (S.D. Fla. 2002) ("Logic dictates that, if [Counsel] has never represented [Witness], [Counsel] never actively represented Petitioner and [Witness], either concurrently or successively. [Counsel] therefore could not have labored, and did not labor, under a conflict of interest for Sixth-Amendment purposes." (citations omitted)).[1] "The existence of an attorney-client relationship is determined under state

---

[1] *Cf. Fazio v. United States*, Nos. 16-cv-8529 (KBF) & 11-cr-0873 (KBF), 2017 WL 4232574, at \*2 (S.D.N.Y. Sept. 22, 2017) ("It is perhaps too basic to merit mentioning – but is an issue here – that in order to maintain a claim of ineffective assistance of counsel, the attorneys at issue must have represented the claimant.

law." *Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994); *see, e.g., Lombardo*, 222 F. Supp. 2d at 1386 (turning to Florida law to determine whether an attorney-client relationship existed). And,

> [u]nder Texas law, there is no attorney-client relationship absent a showing of privity of contract, and an attorney owes no professional duty to a third party or non-client. The attorney-client relationship is viewed as a contractual relationship in which the attorney agrees to render professional services on behalf of the client. The attorney-client relationship can be formed by explicit agreement of the parties or may arise by implication from the parties' actions.

*Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995) (citations omitted); *see also One World Foods, Inc. v. Stubb's Austin Rest. Co. LC*, No. A-15-CA-1071-SS, 2016 WL 6242121, at *5 (W.D. Tex. Oct. 25, 2016) ("The Fifth Circuit has remarked the existence of an attorney-client relationship 'depends on a contract, express or implied, between the parties.' And looking to Texas precedent, the Fifth Circuit concluded the payment of a fee is not required and a contract of employment 'may exist merely as a result of an offer or request made by the client and an acceptance or assent thereto by the attorney.'" (quoting *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990))).

Regardless how the agreement is formed, "there still must be some

---

*See, e.g., United States v. Pungitore*, 910 F.2d 1084, 1143 (3d Cir. 1990) (holding that even if an attorney 'figured prominently in formulating and presenting [a] unified defense, that does not mean that he enjoyed an attorney-client relationship' with each defendant); *United States v. Merlino*, 2 F. Supp. 2d 647, 658 (E.D. Pa. 1997) ('[T]he employment of a joint defense strategy does not establish an attorney-client relationship between every defense attorney and every defendant in a case....'); *Smith v. State*, 703 S.E.2d 629, 637 (Ga. 2010) (refusing to allow a claim for ineffective assistance of counsel based on a co-defendant's attorney).").

manifestation that *both* parties intended to create an attorney-client relationship; therefore, one party's mistaken belief is not sufficient, by itself. Accordingly, we examine the parties' statements and action under an objective standard rather than their subjective beliefs." *Tierra Tech de Mexico SA de CV v. Purvis Equip. Corp.*, No. 3:15-cv-4044-G, 2016 WL 4062070, at *2 (N.D. Tex. July 29, 2016) (quoting *Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 634 (Tex. App. – Houston [14th Dist.] 2010, no pet.); emphasis added by *Tierra Tech*).

There is no evidence that Gibson intended to create an attorney-client relationship with Jenkins. This could end the Court's analysis. But, considering the centrality of plea bargains "to the administration of the criminal justice system," *Missouri v. Frye*, 566 U.S. 134, 143-44 (2012) ("Because ours 'is for the most part a system of pleas, not a system of trials,' it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process." (quoting *Lafler v. Cooper*, 566 U.S. 156, 169-70 (2012))), the assistance that Gibson provided Jenkins on August 1 – as, at the least, the first attorney to present a defendant with his written plea agreement – should not be considered merely de minimis, *see Moss v. United States*, 323 F.3d 445, 458-59 (6th Cir. 2003).

In *Moss*, by contrast, the United States Court of Appeals for the Sixth Circuit accepted the district court's finding that a defendant's six separate post-arraignment meetings with counsel for a co-defendant – during which the defendant "would 'drop things off and picks things up'"; the attorney "expressly denied having any 'substantive discussion of evidence' with" the defendant, "but acknowledged that he provided [the

defendant] with 'copies of motions' and that, if [the defendant] had a question regarding the case, he 'would have been happy' to provide a response"; and the defendant "was confident that he and [the attorney] discussed the case ... , including having conversations regarding 'who was cooperating,' 'what kind of chances' faced the petitioners, and 'what options [were] available'" – neither created nor continued an attorney-client relationship. *Id.* at 458; *see id.* at 458-59 ("While the Court acknowledges the potential ethical risks posed by defense counsel meeting with a represented co-defendant in the absence of the co-defendant's counsel, on the entirety of the record presented herein, we are unwilling to disturb the district court's determination that Attorney Murphy did not provide 'legal advice' during these post-arraignment visits with Moss. ... As we accept the district court's finding that Attorney Murphy provided only de minimis assistance to Moss, we necessarily determine that Attorney Murphy's post-arraignment contact with Moss failed to give rise to attorney-client relationship. Consequently, the petitioners have failed to demonstrate that Attorney Murphy engaged in joint representation during the post-arraignment proceedings. (citing *Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."); citation omitted)).

The undersigned will therefore assume – without finding – the existence of an attorney-client relationship to allow the Court to consider whether a Sixth Amendment violation occurred on the facts now before it.

II.    Actual conflict

Courts applying *Sullivan* "traditionally have couched its test in terms of two questions: (1) whether there was an actual conflict of interest, as opposed to a merely potential or hypothetical conflict; and (2) whether the actual conflict adversely affected counsel's representation." *United States v. Infante*, 404 F.3d 376, 391 (5th Cir. 2005) (citations omitted). The terminology – but not the substance – of this test changed. And, while courts now review a "representation for an 'actual conflict,' which 'is a conflict of interest that adversely affects counsel's performance,'" *United States v. Preston*, 659 F. App'x 169, 179 (5th Cir. 2016) (quoting *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)), "the relevant questions remain the same, and[, here, the Court] must ask whether [Gibson] labored under a conflict of interest, which was not merely hypothetical, and whether that conflict adversely affected the representation (i.e., whether it was an actual conflict)," *Infante*, 404 F.3d at 382 (citations omitted).

"Multiple representation does not necessarily create an actual conflict of interest," *Preston*, 659 F. App'x at 179 (quoting *Culverhouse*, 507 F.3d at 892), but an actual conflict exists "when the attorney knows that his clients' interests diverge and must then choose between the interests of multiple clients, or be compelled to compromise his duty of loyalty," *id.* (quoting *Culverhouse*, 507 F.3d at 893); *see also Culverhouse*, 507 F.3d at 892 (an actual conflict "will exist only when counsel 'is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client'" (quoting *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir.

2006))).

> The question is "highly fact-dependent," and involves several factors, including "(1) whether the attorney has confidential information that is helpful to one client but harmful to the other client; (2) whether and how closely related is the subject matter of the multiple representations; (3) how close in time the multiple representations are; and (4) whether the prior representation has been unambiguously terminated." Also relevant are the "character and extent of the prior representation" (i.e. whether it was "transient or insubstantial"), and whether counsel demonstrates "an abundance of caution" by allowing co-counsel to cross-examine the prior client.

*Preston*, 659 F. App'x at 179 (quoting *United States v. Burns*, 526 F.3d 852, 856, 857 (5th Cir. 2008); *Perillo*, 205 F.3d at 799); *see also Perillo*, 205 F.3d at 782 ("[A]ny categorical treatment of when an actual conflict exists is difficult." (collecting cases)).

First assuming that the assistance Gibson provided Jenkins on August 1, 2013 created an attorney-client relationship between them, if the Court then breaks down the *Sullivan* inquiry into its two traditional parts – (1) real, as opposed to hypothetical, conflict and (2) adverse effect – it has been shown by a preponderance of the evidence that a conflict existed at the time Jenkins executed his plea agreement. Again, assuming a multiple representation occurred on August 1, the representations of Harrison and of Jenkins were temporally the same; their subject matters were very closely related (if not identical); and the factual resume supporting Jenkins's plea agreement implicated Harrison at a time when Harrison was at least reluctant to enter a guilty plea. But that conflict alone does not allow the Court to presume *Strickland* prejudice.

Harrison still must show an adverse effect, which

-16-

may be established with evidence that "some plausible alternative defense strategy or tactic" could have been pursued, but was not because of the actual conflict impairing counsel's performance. Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial.

*Perillo*, 205 F.3d at 781-82 (citations omitted); *see also Culverhouse*, 507 F.3d at 894 n.3 (noting, also applicable here, "that [a movant], in showing an adverse effect, need not show that but for [his counsel's] conflict there was a reasonable probability he would have decided to go to trial. This 'but for' showing is required for *Strickland* prejudice, but we have recognized that 'the adverse effect standard is set intentionally lower than *Strickland*'s actual prejudice standard.'" (quoting *Perillo*, 205 F.3d at 806)).

To show adverse effect, it is not enough for Harrison to argue that proceeding to trial on August 5 was a plausible alternative strategy that was complicated (or even foreclosed) by Gibson's representation of Jenkins on August 1 with regard to Jenkins's plea papers. Harrison must also establish that Gibson did not pursue this alternative – or any other – "because of" the assistance that he provided Jenkins. *See, e.g., Perillo*, 205 F.3d at 807 ("An adverse effect on counsel's performance may be shown with evidence that counsel's judgment was actually 'fettered by concern' over the effect of certain trial decisions on other clients. ... In this case, Perillo must show, not only that Skelton's performance was compromised, but that the compromises revealed in the record were generated by the actual conflict between Fletcher's and Perillo's interests." (citation omitted)); *cf. Infante*, 404 F.3d at 391 (noting that *Sullivan*, as opposed to *Strickland*, applies where a movant's "involves his attorney's conflict of interest

-17-

stemming from multiple representation, rather than a conflict of interest springing 'from a conflict between the attorney's personal interest and that of his client'" (quoting *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002) (quoting, in turn, *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc)))).

Put another way, "the burden is on [Harrison] to show" by a preponderance of the evidence "that an actual conflict was caused by the alleged [multiple] representation ... such that 'there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict.'" *United States v. Wade*, Crim. No. H-07-0351-04 & Civ. A. No. H-10-3973, 2011 WL 2604826, at *4 (S.D. Tex. June 30, 2011) (quoting *Infante*, 404 F.3d at 393). This requirement is consistent with the adverse-effect prong of the *Sullivan* test as articulated by courts in other circuits. *See, e.g., Reynolds v. Chapman*, 253 F.3d 1337, 1342 (11th Cir. 2001) (noting that the final prong of showing an adverse effect is "that the alternative strategy was not followed because it conflicted with the attorney's external loyalties"); *Garguilio v. Heath*, 293 F.R.D. 146, 153 (E.D.N.Y. 2013) ("To demonstrate adverse effect ... the petitioner must show 'causation – that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' An actual conflict 'cannot be said to have caused an attorney to forgo the alternative defense' if there were reasons not to assert it 'independent of the actual conflict.'" (citations and brackets omitted)); *Tilley v. Steele*, No. 4:06CV01822ERW, 2010 WL 681373, at *9 (E.D. Mo. Feb. 22, 2010) ("To show that the conflict caused defense counsel's choice to engage or not to engage in particular conduct, a habeas petitioner

-18-

must identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." (citing *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006) (citing, in turn, *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004)))).

Jenkins's signing his plea papers without his own attorney present and in Gibson's office with Gibson present may or may not have been a mistake. But, even if the Court accepts that Gibson undertook representation of Jenkins for the purpose of his executing plea papers, there is no evidence – much less has it been shown by a preponderance of the evidence – that, concerning Gibson's representation of Harrison, Gibson took any actions or failed to take any actions based on a duty of loyalty to Jenkins. Thus, a lack of evidence linking (1) Gibson's choices as he continued to represent Harrison to (2) some supposed loyalty to Jenkins stemming from Gibson's interaction with him on August 1, 2013 requires the Court to find, on these facts, that an actual conflict of interest – that is, one that adversely affected Gibson's representation of Harrison because a plausible alternative defense strategy or tactic was not pursued because of Gibson's loyalty to Jenkins – failed to materialize.

### Recommendation

The Court should deny Movant Emanuel James Harrison's claim of ineffective assistance of counsel based on an actual conflict of interest.

A copy of these findings, conclusions, and recommendation shall be served on all

parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: June 28, 2019

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE